Argued and submitted June 19, 1989, resubmitted In Banc May 9, affirmed
October 3, 1990

# STATE OF OREGON,
*Appellant,*

*v.*

# JAMES DOUGLAS SAUNDERS,
*Respondent.*

### (87-262; CA A49948)

799 P2d 159

Janet A. Klapstein, Assistant Attorney General, Salem, argued the cause for appellant. With her on the brief were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Thomas C. Peachey, The Dalles, argued the cause for respondent. With him on the brief was Lewis, Foster & Peachey, The Dalles.

RICHARDSON, J.

Riggs, J., dissenting.

## RICHARDSON, J.

The state appeals an order suppressing evidence discovered during a warrantless search of defendant's interstate shipment of a box of sturgeon eggs (roe). It argues that the search was either a statutorily authorized administrative search or it was lawful, because there were probable cause and exigent circumstances. We affirm.

The court made findings that neither party disputes, which we summarize. Defendant is a licensed wholesale fish dealer doing business as King Fish Trading Company. In early 1987, Officer Pert, a member of the Oregon State Police Fish and Game Division, discovered, during examination of air freight shipping records, that defendant had made seven shipments of roe during a five-week period in 1986 in amounts ranging from 10 to 45 pounds. Regulations for commercial fishing on the Columbia River prohibit the taking of sturgeon less than four feet and greater than six feet long. OAR 635-04-090(1)(a). Female sturgeon less than six feet long are generally not mature enough to produce roe. Accordingly, the number, frequency and weight of defendant's shipments led Pert to believe that defendant was shipping roe taken from sturgeon longer than the legal limit.

On December 1, 1987, Pert was at the Portland International Airport and saw a package delivered from defendant's business for shipment. The invoice on the package stated that it contained 44 pounds of raw sturgeon eggs. Pert testified that packages of roe are generally shipped from the airport within an hour after receipt. He immediately opened the box and discovered three, 10-pound bags of roe. He seized the box and its contents and confirmed by laboratory analysis the next day that the roe came from a single sturgeon skein and that the sturgeon's length exceeded the legal limit.

Defendant was charged with failure to keep adequate records of food fish, ORS 508.535(1), unlawful purchase of sturgeon eggs removed from the body cavity before sale, OAR 635-41-060(2)(f), and unlawful possession of oversized food fish, OAR 635-41-060(1), all class A misdemeanors. ORS 506.991. He moved to suppress the evidence, arguing that Pert's warrantless search and seizure violated the Oregon and federal constitutions. The court granted the motion, and the state appeals. ORS 138.060(3).

■    A warrantless search is unlawful, unless it falls within one of the narrow exceptions to the warrant requirement. We first determine whether the search was within the parameters of a statute or the Oregon Constitution. *State v. Kennedy,* 295 Or 260, 262, 666 P2d 1316 (1983).

The state first contends that a warrant was unnecessary, because the seizure was pursuant to an "administrative search" authorized by ORS 506.550. According to the state, that statute authorized the search and seizure for the same reasons that we upheld a warrantless inspection in *State v. Westside Fish Co.,* 31 Or App 299, 570 P2d 401 (1977). The statute involved there, ORS 506.620, provides:

> "The director or authorized agent may enter and inspect all canneries, cold storage houses, packing establishments, business places, boats, fishing gear, and all property used in the taking, processing and packing of food fish, for the purpose of enforcing the commercial fishing laws."

ORS 506.550, on which the state depends here, provides:

> "The officers mentioned in ORS 506.521 may search and examine all places where food fish may be kept, sold or secreted and examine all packages, boxes and bundles held either for storage or shipment which they have reason to believe contain evidence of violation of the commercial fishing laws."[1]

In *Westside Fish,* the defendant was a licensed food fish canner and wholesale dealer. State fish and game officers entered the defendant's business premises without a warrant and without probable cause. They discovered unlawfully processed food fish, and the defendant was charged with several offenses. The entry by the officers was made pursuant to ORS 506.620, which we concluded authorized an administrative inspection without a warrant or cause to believe that evidence or fruits of a regulatory violation were on the premises. The issue was whether that statutory authority was constitutional

---

[1] Before its amendment in 1965, ORS 506.550 provided:

"The officers * * * may search and examine all boats, conveyances, vehicles, cold storage rooms, warehouses, taverns, boarding houses, restaurants, outhouses, depots, hotels and other places * * *."

That list of locations was deleted and replaced by the description "all places."

under the Fourth Amendment to the United States Constitution or Article I, section 9, of the state constitution. We concluded that ORS 506.620 authorized administrative inspections and was constitutional for the same reasons that the United States Supreme Court upheld inspections of a pawn shop pursuant to the Federal Gun Control Act of 1968, 18 USC § 921, in *United States v. Biswell,* 406 US 311, 92 S Ct 1593, 32 L Ed 2d 87 (1972).

Because of our dependence on *Biswell* and the federal line of reasoning, it is more appropriate to discuss the federal analysis than our description of it in *Westside Fish. Biswell* was decided in 1972, and by 1987 the Supreme Court had further refined the contours of the *Biswell* doctrine in *New York v. Burger,* 482 US 691, 107 S Ct 2636, 96 L Ed 2d 601 (1987). There, the Court said that a warrantless inspection of a pervasively regulated business will be deemed constitutionally reasonable

> "only so long as three criteria are met. First, there must be a 'substantial' government interest that informs the regulatory scheme pursuant to which the inspection is made. * * *
>
> "Second, the warrantless inspection must be 'necessary to further [the] regulatory scheme.' * * *
>
> "Finally, 'the statute's inspection program, in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant.' * * * In other words, the regulatory statute must perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers." 482 US at 702-03. (Citations omitted; brackets theirs.)

As we said in *Westside Fish,* the commercial fish industry is closely regulated, and there is a great public interest in protecting it as an important natural resource. Also, as the Court said in *Biswell,* a routine "inspection is a crucial part of the regulatory scheme." 406 US at 315. Two of the criteria for a constitutional inspection are arguably satisfied by the general regulatory scheme in ORS chapter 506. Insofar as those two criteria and the regulatory purposes are implemented by *ORS 506.620,* the third requirement of *Biswell* is satisfied.

However, although ORS 506.550 is part of a broad statutory scheme of commercial fish regulation, it does not even marginally implement a routine inspection program. The Court in *New York v. Burger, supra,* said that the statutory inspection scheme there provided a "constitutionally adequate substitute for a warrant," because it informed the operator of the business that *inspections* will be made on a regular basis and the scope of those inspections. Additionally, the Court noted that the program was such that the inspections did not constitute the discretionary act of the government official, but were conducted pursuant to statutory criteria. *See also Donovan v. Dewey,* 452 US 594, 101 S Ct 2534, 69 L Ed 2d 262 (1981).

■      ORS 506.550, involved in this case, gives authority to specific officers to "search and examine" specified places and things while ORS 506.620, involved in *Westside Fish,* gives the Director of the Fish and Game Commission or his designee authority to "enter and inspect" specific places and things. The state argues that the authority of the two statutes, although phrased differently, is identical. In the abstract, what an officer does under either statute in a particular instance may be the same; but in the context of the *Biswell* and *Westside Fish* analysis, inspection has a particular significance. As we interpreted ORS 506.620 in *Westside Fish,* it provides for routine inspections without the need for cause to believe that a violation will be discovered. Interpreted in that way, the statute provides the proprietor with the requisite knowledge that named places and things related to his commercial fish business will be periodically inspected to insure compliance with the relevant regulations. By contrast, the authority to *search* in ORS 506.550, when the officer has "reason to believe" that there is evidence of a violation of commercial fishing laws, is the antithesis of the type of regulatory inspection program described in *Westside Fish, Biswell, New York v. Burger, supra,* and *Donovan v. Dewey, supra.*

ORS 506.550 authorizes a search of all places where food fish may be kept, sold or secreted. The search is not limited to premises or equipment used in the commercial enterprise of fish taking and processing, as are the inspections allowed by ORS 506.620. The statute at issue in this case, ORS 506.550, is part of a remedial program of enforcement of the criminal provisions of the commercial fishing laws, *see* ORS

506.506, while the statute at issue in *Westside Fish* was an implementing force to seek compliance with the commercial fishing regulations. If the purpose of the statutory directive is to search for evidence of a crime, then the constitutional strictures of Article I, section 9, must be satisfied. *Nelson v. Lane County,* 304 Or 97, 743 P2d 692 (1987). Calling the activity an administrative inspection, or categorizing it as a program necessary for enforcement of laws relating to a pervasively regulated industry, does not sufficiently mask the real character and make the statute constitutional.

We need not, however, declare the statute unconstitutional, because we conclude that, unlike ORS 506.620, it does not authorize a warrantless search. There is nothing in the wording of the statute that says literally, or by implication, that enforcement officers may bypass limitations of the state or federal constitutions in searching for evidence of criminal activity. The statute is part of a series of sections that spell out the authority of the officers who have been designated to enforce the commercial fishing laws. ORS 506.511 to ORS 506.526. In short, ORS 506.550 does not authorize an "administrative search" or a search that does not comply with Article I, section 9.

We turn then to whether the search here violated Article I, section 9.[2] The state argues that the search was constitutional, even without a warrant, because Pert had probable cause to believe that the package contained evidence of a crime and that exigent circumstances excused him from seeking a warrant. We agree with the trial court's conclusion that there was probable cause to justify the search. However, we also agree with the trial court that the state has not established that there were exigent circumstances.

■ Exigent circumstances that will excuse procuring a warrant have been defined as circumstances giving rise to an emergency situation requiring swift action to prevent destruction of evidence. *State v. Girard,* 276 Or 511, 555 P2d 445 (1976). It is a rule of practical necessity to search or seize evidence before a warrant can be obtained. *State v. Peller,* 287 Or 255, 598 P2d 684 (1979); *State v. Greene,* 285 Or 337, 591

---

[2] Because we conclude that the search and seizure violated the state constitution, we need not address federal constitutional issues.

P2d 1362 (1979). However, "practical necessity" is not simply a matter of the convenience of the searching officers.

■■ The state argues that immediate action was necessary because Pert did not have sufficient information to obtain a warrant before he saw the package and the invoice at the airport. Because the package was to be shipped within an hour of its arrival and contained perishable material, it was necessary to open it immediately, the state contends. The trial court, in its written decision, said in response to the state's argument:

> " 'Exigent circumstances involve an emergency situation requiring swift action to prevent . . . the destruction of evidence.' [State] v. Roberts, 75 Or App 292[, 295, 706 P2d 564] (1985).

> "Once Officer Pert had seized the package, it was incumbent upon the State to show why it could not get a warrant (as was done in [State] v. Kosta, 75 Or App 713[, 708 P2d 365] (1985)), within a reasonable period of time. [State] v. Roberts, supra; [State] v. Robert [sic], 46 Or App 843[, 612 P2d 771] (1980).

> "The state failed to carry its burden to prove exigency and the Defendant's Motion to Suppress is granted."

The court's conclusion is not totally clear. It may have determined that there were exigent circumstances to justify seizing the package but not opening it. Its citation to State v. Kosta, 75 Or App 713, 708 P2d 365 (1985), aff'd 304 Or 549, 748 P2d 72 (1987), suggests that. In Kosta, the police seized a package which was being shipped by Federal Express and then obtained a warrant to open it. The trial court also cited State v. Rubert, 46 Or App 843, 612 P2d 771 (1980), and may have concluded that there were no exigent circumstances to justify a warrantless seizure of the package. In any event, either conclusion is subject to review as a matter of law on the facts found by the trial court.

The only facts that bear on the issue of exigent circumstances were that shipments of roe are at the air terminal for only about an hour from receipt to shipment and that air freight employees will not hold the shipments until the officer arrives. The state argues that the time limitations make it impossible, or at least impractical, for an officer to obtain a warrant. We note that Pert seized the package because he believed that he had authority to do so without a warrant

under ORS 506.550. That statute is the state's primary justification for the warrantless seizure. Consequently, the question of the practical necessity to proceed without a warrant was litigated only as an alternative position, and there was no evidence about how long it would have taken Pert to obtain a warrant, if he had been so inclined. The fact that there are time constraints in obtaining and preserving evidence does not automatically equal exigent circumstances. *State v. Roberts,* 75 Or App 292, 706 P2d 564 (1985).

A warrantless search is not simply a matter of convenience for the police officer. The state did not show that there was a justification for seizing the package without a warrant. It is unnecessary to determine if a warrant was needed to open the package.

Affirmed.

**RIGGS, J.,** dissenting.

I dissent from the majority opinion, because I believe that the action taken by Officer Pert was authorized by ORS 506.550 and that the statute complies with Article I, section 9, of the Oregon Constitution and the Fourth Amendment.

The majority acknowledges that in *State v. Westside Fish Co.,* 31 Or App 299, 570 P2d 401 (1977), we upheld a warrantless search and seizure of unlawfully possessed fish under the authority of a similar statute, ORS 506.620, but concludes that *Westside Fish* has no application here. The majority begins its explanation of that conclusion with a discussion of Fourth Amendment cases because, in its view, our decision in *Westside Fish* was dependent on *United States v. Biswell,* 406 US 311, 92 S Ct 1593, 32 L Ed 2d 87 (1972), and "the federal line of reasoning."

The majority correctly sets out the criteria for determining if a warrantless inspection of a pervasively regulated business will be deemed constitutionally reasonable. The majority holds that the first two criteria under *New York v. Burger,* 482 US 691, 107 S Ct 2636, 96 L Ed 2d 601 (1987), are satisfied, that there is a significant public interest in protecting our important public resource and that a warrantless inspection program is necessary to carry out the regulatory scheme. It decides, however, that ORS 506.550 does not satisfy the last criteria, because "it does not even marginally

implement a routine inspection program." 103 Or App at 493.
I disagree.

Under the third criterion in *Burger,* the regulatory
statute must perform the two basic functions of a warrant: It
must advise the owner of the premises that the search is made
pursuant to the law and has a properly defined scope, and it
must limit the discretion of the inspecting officers. In analyz-
ing whether the statute at issue in *Burger* that authorized
warrantless inspections of automobile junkyards met this cri-
teria, the Court concluded that it did, because:

> "The statute informs the operator of a vehicle dismantling
> business that inspections will be made on a regular basis.
> Thus, the vehicle dismantler knows that the inspections to
> which he is subject do not constitute discretionary acts by a
> government official but are conducted pursuant to statute.
> Section 415-a5 also sets forth the scope of the inspection and,
> accordingly, places the operator on notice as to how to comply
> with the statute. In addition, it notifies the operator as to who
> is authorized to conduct an inspection." 482 US at 711. (Cita-
> tions omitted.)

Similarly, here, persons participating in the commer-
cial fishing industry are aware that inspections of their prop-
erty may be conducted pursuant to the commercial fishing
laws by state game officers, as well as other authorized agents
of the Director of the Department of Fish and Wildlife. The
scope of the inspection under both ORS 506.550 and ORS
506.620 is also sufficiently defined. The statutes and regula-
tions relating to commercial fishing clearly advise persons
involved in commercial fishing operations how to comply with
those laws.

The majority concludes that, although ORS 506.620
satisfies the third criterion, ORS 506.550 does not, because
the two statutes perform quite different functions:

> "The statute at issue in this case, ORS 506.550, is part of a
> remedial program of enforcement of the criminal provisions of
> the commercial fishing laws, *see* ORS 506.506, while the stat-
> ute at issue in *Westside Fish* was an implementing force to
> seek compliance with the commercial fishing regulations."
> 103 Or App at 493-94.

However, that conclusion does not really describe any mean-
ingful distinction between the two statutes. There is, in fact,

no difference between "a remedial program of enforcement of the commercial fishing laws" and "an implementing force to seek compliance with the commercial fishing regulation," because all violations of commercial fishing laws are crimes. ORS 506.991. Enforcing the criminal provisions of the commercial fishing laws and forcing compliance with commercial fishing regulations are the same thing. Under both, state game officers or other authorized agents of the Department of Fish and Wildlife may enter commercial fishing operations, look around to see if the commercial fishing laws are being complied with and issue a citation or make an arrest if they are not.

The majority finds a significant difference in the statutes, because ORS 506.620 authorizes officers to "enter and inspect" and ORS 506.550 authorizes them to "search and examine." That is a distinction without a difference.[1] The actions that may be taken under both statutes are essentially the same. The majority acknowledges that what an officer physically does under each statute may be the same but notes that, in the context of the federal cases, inspection has a particular significance.

> "As we interpreted ORS 506.620 in *Westside Fish,* it provides for routine inspections without the need for cause to believe that a violation will be discovered. Interpreted in that way, the statute provides the proprietor with the requisite knowledge that named places and things related to his commercial fish business will be periodically inspected to insure compliance with the relevant regulations. By contrast, the authority to search in ORS 506.550, when the officer has 'reason to believe' that there is evidence of a violation of commercial fishing laws, is the antithesis of the type of regulatory inspection program described in *Westside Fish, Biswell, New York v. Burger, supra,* and *Donovan v. Dewey,* [452 US 594, 101 S Ct 2534, 69 L Ed 2d 262 (1981)]." 103 Or App at 493.

The problem with the majority's conclusion is that it misreads ORS 506.550. That statute does not require that an officer have "reason to believe" that there is evidence of a

---

[1] In *Westside Fish,* we did not seem to believe that there was a difference between the terms. There, we characterized the action taken by the police under ORS 506.620, which authorizes entry and inspection, as a search: "[T]he *search* of defendant's freezer and the seizure of his fish were lawful." *State v. Westside Fish Co., supra,* 31 Or App at 303. (Emphasis supplied.)

violation of the commercial fishing laws before entering. Rather, the "reason to believe" requirement qualifies the last phrase in the statute. An officer must have "reason to believe" that a package, box or bundle held for storage or shipment contains evidence of a violation before he can examine it.[2]

The majority also distinguishes the two statutes on the basis that ORS 506.620 limits searches to premises used in the commercial enterprise of fish taking and processing and ORS 506.550 allows a search of any place where food fish may be kept, sold or secreted. Arguably, the language of ORS 506.550 could be read quite broadly to authorize a search of any place that theoretically could be used for hiding fish. However, we ought to read the language to authorize only the inspection of places where commercial food fish are ordinarily kept or sold. This reading of the statute is consistent with the purpose of the statute to ensure compliance with commercial fishing regulations and is consistent with the latter portion of the statute that limits the inspection of packages, boxes or bundles to those used for shipment or storage of food fish. Further, this construction of the statute is consistent with the principle that statutes should be given a narrowing construction to avoid concerns about constitutionality. *Molodyh v. Truck Insurance Exchange,* 304 Or 290, 299, 744 P2d 992 (1987).

I would hold that ORS 506.550 satisfies the criteria in *Burger* for a warrantless inspection and, therefore, complies with the Fourth Amendment. As with ORS 506.620, ORS 506.550 provides a person involved in the industry with notice that named places and things related to his commercial fish business will be periodically inspected to insure compliance with the relevant statutes.

I would hold also that ORS 506.550 complies with Article I, section 9, which protects the privacy interest that an individual has from particular forms of government scrutiny. *State v. Campbell,* 306 Or 157, 759 P2d 1040 (1988).

"A privacy interest, as that phrase is used in this court's

---

[2] The discretion of inspecting officers is actually more limited by ORS 506.550 than ORS 506.620. Under ORS 506.550, a container may not be examined unless the officer has reason to believe that it contains evidence of a violation. Under ORS 506.620, fishing gear and all property used in commercial fishing activities may be inspected without any belief that evidence of a violation is there.

Article I, section 9, opinions, is an interest in freedom from particular forms of scrutiny. The interest is not one of freedom from scrutiny in general, because, if that were the case, any form of scrutiny would infringe a privacy interest and thereby be considered a search. * * *

"Government scrutiny aside, individual freedom from scrutiny is determined by social and legal norms of behavior, such as trespass laws and conventions against eavesdropping." 306 Or at 170.

Whether government conduct in a particular instance is an overly intrusive form of government scrutiny, and therefore a search, depends on the nature and purpose of the government's conduct, as well as the nature of the individual's privacy interest.

As discussed above, in *State v. Westside Fish Co., supra,* we found that there is a strong public interest in the protection of Oregon's fish runs, which are a precious natural and economic resource. We also recognized that the commercial fishing industry is pervasively regulated and has been extensively regulated throughout this century. ORS 506.550 has not been amended since 1965, and the warrantless inspection authority, from which the present statute derives, has existed since 1921. Or Laws 1921, ch 105, § 26. As discussed above, persons involved in the commercial fishing industry must be aware of the law and, therefore, must have an expectation that their commercial fishing activities will be subject to government scrutiny.

In addition to the fact that government inspections are a common and expected occurrence in the commercial fishing industry, the authority to inspect is critical to the effectiveness of the regulatory scheme. As we recognized in *State v. Westside Fish Co., supra,* because the object of the regulations is of such transient and disposable nature, advance notice of inspection would likely make inspection ineffective. In adopting ORS 506.550, the legislature has balanced the need for this enforcement tool against the privacy interest of persons engaged in the industry by allowing warrantless searches under limited circumstances. I do not think that the legislature's judgment on this issue violates section 9.

Even if it were determined that ORS 506.550 does not authorize this search and seizure, there were probable cause

and exigent circumstances to justify the action taken. The trial court held, and the majority agrees, that Pert had probable cause to believe that the package that he seized contained evidence of a crime.

I would hold that there were also exigent circumstances to justify the warrantless seizure.[3] The trial court found exigent circumstances to justify Pert's seizure of the package. It found that "[i]t is difficult for the officer to actually intercept the shipments as they are at the air terminal for only about 1 hour from receipt to shipment. Air freight employees will not hold the shipments until the officer gets there." The trial court then concluded that, although Pert could lawfully seize the package, "it was incumbent upon the State to show why it could not get a warrant" before searching its contents.

I agree with the trial court's determination that the seizure was justified. As the trial court concluded, it is difficult to intercept shipments, because they are at the airport only about one hour and the air freight employees will not hold the packages. In fact, Pert had missed stopping two shipments the year before. It is reasonable to infer that, if he had not seized the package, he would have lost all access to it.

After Pert lawfully seized the package, he could search its contents without a warrant, if he had probable cause to believe that it contained evidence of the crime. *State v. Herbert,* 302 Or 237, 243, 729 P2d 547 (1986); *State v. Larsen,* 84 Or App 403, 405-06, 734 P2d 362 (1987). I conclude that he did have probable cause. The label on the package announced that the package contained 44 pounds of sturgeon roe. On the basis of his training and experience, he knew that it was highly unlikely that that amount of roe could be obtained from legal

---

[3] Defendant insists that, even though Pert was not aware that there would be a package at the airport when he went there for a periodic inspection, he should have obtained a warrant before going, because he had a continued interest in intercepting a shipment of roe from defendant's company. Such a requirement would be unreasonable. Pert had been watching for a shipment of roe from defendant's company since he noted its extensive shipments in 1986. Although he had periodically checked shipments at the airport, he had been unable to intercept any in 1987. Under defendant's theory, Pert should have obtained a warrant every time that he went to the airport. However, it is doubtful whether under those circumstances he could have obtained one, because he usually would not have had sufficient information to describe with particularity the item to be searched as required by ORS 133.545(4).

size sturgeon. Therefore, because he had lawfully seized the package and had probable cause to believe that it contained evidence of a crime, his subsequent search of the package was lawful. *State v. Herbert, supra,* 302 Or at 243; *State v. Larsen, supra,* 84 Or App at 406.

Warren, J., joins in this dissent.