Argued December 21, 1978, affirmed May 7, 1979

STATE OF OREGON, *Respondent,*
*v.*
RICKEY DON WESSON, *Appellant.*
(No. C 76-09-13171, CA 10949)
594 P2d 429

J. Marvin Kuhn, Deputy Public Defender, Salem, argued the cause for appellant. With him on the brief was Gary D. Babcock, Public Defender, Salem.

[99]

Melinda L. Bruce, Assistant Attorney General, Salem, argued the cause for respondent. With her on the brief were James A. Redden, Attorney General, and Walter L. Barrie, Solicitor General, Salem.

Before Schwab, Chief Judge, and Thornton, Buttler, and Gillette, Judges.

GILLETTE, J.

■■■■■■

## GILLETTE, J.

Defendant appeals from his conviction by the court for burglary in the first degree, ORS 164.225. He assigns as error the trial court's denial of his motion to suppress (1) evidence seized after his arrest and (2) results of a palm print comparison linking him to the crime for which he was convicted. We affirm.

The circumstances of defendant's arrest may be summarized as follows. On the morning of August 10, 1976, officers noticed a small foreign car with its doors and storage compartment open, parked adjacent to a house and illegally blocking an alley. Upon driving into the alley and parking their marked police car, the uniformed officers noticed stereo equipment around the car and two men—one of whom was the defendant—next to the car who appeared to the officers to be loading the car.

At this point the officers suspected that the two men were in the process of stealing stereo equipment. One officer saw defendant pick up some stereo equipment and proceed toward the back yard of the house, and asked him to stop so that they could talk for a minute. Defendant looked at the officer but did not respond, instead proceeding toward the gate to the back yard. There followed repeated requests to the same effect which defendant ignored as he moved in a "hurried motion" into the house.

The officer followed defendant into the house, noticing stereo components in plain view on the floor. After hearing some commotion in the front of the house, the officer drew his weapon and told defendant to come out slowly with his hands where they could be seen. Defendant complied, but refused to answer the officer's inquiries about the stereo equipment. Around this time defendant's brother (who had been the other man at the car), followed by the other officer, entered the house, noisily challenged the officers' right to be there, and subsequently assaulted the officers. After

[101]

this altercation, defendant and his brother were arrested. It was later discovered that defendant's brother was helping defendant move into the house, which is owned and lived in by members of their family.

One of the officers had noticed from where he was standing inside the house that the serial number on one of the speakers was partially obliterated. After the arrest, the stereo equipment was seized and the speaker was discovered to have been taken in a burglary nearly two years previously. A latent palm print taken at the scene of that burglary was matched against defendant's. After the trial court denied defendant's motion to suppress the stereo equipment and the palm print comparison, defendant stipulated to the facts and was found guilty of burglary.

The parties appear to be in agreement that, if the officer had a right to enter the defendant's house, the observations made thereafter would fall within the "plain view" exception to the requirement that searches and seizures be pursuant to warrant, so that the resulting seizures would be lawful. The crucial question thus becomes: did the officer lawfully enter the house? These are two theories upon which the entry could be justified: (1) the officers had probable cause to arrest defendant, and so fresh pursuit into the house was valid; or (2) the authority to "stop" includes the authority to reasonably pursue one who declines to stop, even if such pursuit takes one into a house. We do not reach the second theory because we find the officers' actions here valid under the first.

A police officer may arrest a driver for a parking violation. The evidence here showed that a parking violation had occurred: the car was parked in such a manner as to block the alleyway. *See* ORS 487.575.[1]

---

[1] Where parking is a violation of a state statute, it is a Class D traffic infraction. *See* ORS 487.580. An officer may either arrest or cite for a Class D infraction. *See* ORS 484.100.

The dissent argues that the first of these statutes, ORS 487.575(1), is inapplicable to the present circumstance. Although it would be sufficient

Moreover, the car doors had been left open in a manner blocking approaching traffic. This, too, was a traffic infraction for which the driver could be arrested.[2] The only real question is whether there was probable cause to arrest defendant. Probable cause is "a well warranted suspicion" justifying a reasonable man in the belief that a certain set of facts exists. *State v. Basler,* 24 Or App 723, 727, 546 P2d 1084 *rev den* (1976). We think that the improper parking of the car with its doors left open, the defendant's presence in the immediate vicinity of the car, the officers' appearance in uniform and in a marked patrol car, and the defendant's retreat from the area despite an officer's request that he halt are facts rising to the level of "well warranted suspicion."[3] Having probable cause to arrest, the officer had a right to enter the house to effect the arrest. ORS 133.235(5). Since defendant was aware the officer was after him, the officer had authority to enter the house without a warrant. *See, e.g., State v. Girard,* 25 Or App 169, 548 P2d 505, *rev'd on other grounds,* 276 Or 511, 555 P2d 445 (1976).

The fact that the officer had another justification in mind does not alter his right to make an arrest on the facts stated. *See State v. Carter/Dawson,* 34 Or App 21,

that the other statute—ORS 487.630—is applicable, this statute is applicable as well. The phrase "upon a roadway outside a business or residence district" is, in our view, merely intended as an acknowledgment that automobiles may be parked *on* a roadway, *i.e.,* next to a curb, in front of businesses or residences because such use of the roadway is customary. Alleys, too, are roadways. ORS 487.005(1). But alleys *behind* or *beside* businesses or residences are, in our view, roadways "outside a business or residence district" because parking in them does not provide the same kind of access that parking on streets does.

[2] ORS 487.630. *See supra* note 1.

[3] The fact that defendant was wearing a red and black robe, pants, and pink curlers covered by a hairnet detracts at least slightly from the likelihood defendant was the driver of the car, and might even be said to make the other person present the more logical suspect at the moment the police arrived. Even assuming, however, that the police could only apprehend the most logical of two suspects—a proposition we find very dubious—defendant's very unwillingness to stop even momentarily to talk tipped the scales in his direction and made him the most logical suspect.

[103]

578 P2d 790, *rev allowed* 284 Or 521 (1978). *Cf. State v. Cloman,* 254 Or 1, 456 P2d 67 (1969).

Affirmed.

**BUTTLER, J.,** dissenting.

I dissent because I do not think the police officers had the right to enter defendant's home without a warrant and without his consent. There is no question in this case that the officers did not stop at defendant's house because of a parking violation. Rather, they were patrolling a "high crime area" and because, they said, 60% of all burglaries are committed at that time of the morning, they stopped because they suspected that defendant and his brother were burglarizing the house, rather than moving into it. They did not ask either the defendant or his brother for his driver's license or the registration to the car; nor did they ask either man to move the car or issue a citation. Instead, their first questions, after asking the defendant to stop and talk, related to the stereo equipment.

In short, the parking violation was a pretext for stopping. In *State v. Carter/Dawson,* 34 Or App 21, 578 P2d 790, *rev allowed* 284 Or 521 (1978), a majority of the court upheld a pretext traffic stop, but limited the extent of the intrusion to matters related to the traffic reason for the stop. The court said:

> "The constitutional and statutory law blends into a single rule: Traffic stops should be the minimum possible intrusion on Oregon motorists, and not an excuse to begin questioning, searching or investigating that is unrelated to the traffic reason for the stop." 34 Or App at 32.

This case goes far beyond what we upheld in *Carter/Dawson.* It can hardly be said that pursuing defendant into his house was the "minimum possible intrusion" for a stop objectively justified as one for a parking violation. If the officers had asked either man to move the car or suffer arrest, if, indeed, an arrest

may be justified, perhaps the result would be different. But they did not do so because they were not concerned with a parking violation. The majority, without even mentioning *Carter/Dawson,* now holds that after a stop for pretended reasons anything goes if the slightest justification can be manufactured after the fact. With that I cannot agree.

Apparently, the majority is willing to escalate a pretext stop based upon what the officers characterized as a violation of a city ordinance, into a violation, tenuous at best, of a state statute authorizing the arrest of defendant after hot pursuit into his home. Even assuming that rationale may be justified in an appropriate case, the majority's effort here is not persuasive—it is a house of cards.

First, the majority attempts to find a state statute which was violated, even though no such contention was made in either the trial court or in this court. Its effort is akin to one using a Gatling gun on a loose mount: many shots are fired, but no bulls-eye.

The majority relies on ORS 487.575, 487.580 and 487.630. ORS 487.575(1) provides:

> "A person who stops, parks or leaves standing any vehicle, whether attended or unattended, upon a roadway outside a business or residence district, when it is practicable to stop, park or leave his vehicle standing off the roadway, commits the offense of unlawfully parking in a roadway."

It should be noted that the car was not parked "upon a roadway," but was parked in an alley, which is defined in ORS 487.005(1) as a street or highway primarily intended to provide access to the rear or side of the lots or buildings in urban areas and not intended for through vehicular traffic. Second, the car was not parked "outside a business or residence district." Third, there is no showing that it was "practicable to stop, park or leave his vehicle standing off the roadway."

[105]

Nor do I find anything in ORS 487.580 to support the majority position. In fact, subsection (3)(b) of that section provides:

> "(3) A driver shall not park a vehicle except momentarily for the purpose of and while actually engaged in loading or unloading property or passengers:
>
> "* * * * *
>
> "(b) At any place where official signs prohibit parking."

Even assuming that there was an "official sign," this subsection appears to permit what the defendant and his brother were doing in this case.

We cannot tell from this record whether ORS 487.630[1] was violated because it does not tell us whether it was the car's open door which barred passage of another car, or whether the space occupied by the parked car precluded passage. The former would be a violation, the latter would not.

Assuming that a state statute was violated, the proposition that the officers had probable cause to believe defendant was the driver of the car, and therefore was subject to arrest, is also unpersuasive. What the police officers observed initially was the defendant and his brother standing beside the car. The defendant was wearing a red and black robe, pants and pink curlers in his hair covered by a hairnet; his brother was wearing street clothes. Subsequently, the police officers saw the defendant carrying things from

---

[1] ORS 487.630 provides:

"(1) A person commits the offense of unlawful opening or closing vehicle door if he opens the door of a vehicle on the side available to moving traffic, except:

"(a) When it is reasonably safe to do so; and

"(b) When it can be done without interfering with the movement of traffic.

"(2) A person shall not leave a door open on the side of a vehicle available to moving traffic for a period of time longer than necessary to load or unload passengers.

"(3) Unlawful opening or closing vehicle door or leaving vehicle door open is a Class D traffic infraction."

[106]

the car into the house with his brother remaining by the car. It does not seem to me that this observation amounted to a "well-warranted suspicion" justifying a reasonable man in the belief that the defendant was the driver of the car.

I would reverse the trial court's denial of the motion to suppress the evidence seized after the officers' entry into the defendant's home, but I would remand the case for findings (*see State v. Addicks,* 28 Or App 663, 560 P2d 1095 (1977)) on whether the fingerprint evidence would have been inevitably discovered from an independent source. *See State v. Paz,* 31 Or App 851, 572 P2d 1036 (1977), *rev den*282 Or 189 (1978). There was testimony that might support a finding that the fingerprint comparison involved here would inevitably have been made regardless of the arrest. *See State v. Addicks, supra.*